**FINLAY–TAMPICO OIL CO. et al. v. ROBBINS. (No. 1392.)**

(Court of Civil Appeals of Texas. El Paso. Jan. 11, 1923.)

**1. Brokers ⟨⟩⟩49(1) — Introducing man who found men to sink well for defendants held to entitle broker to compensation.**

Where plaintiff contracted with defendants who owned certain oil lands to procure a man or number of individuals, company, or corporation who would contract with defendants to drill for oil on their lands by sinking a well to the depth of 3,500 feet upon certain conditions in consideration of a transfer to plaintiff, if

successful, of four sections of land, plaintiff had earned his compensation where he introduced to defendants a person who in turn introduced certain persons who sunk the well.

**2. Appeal and error ⟨⟩⟩978(3)—Misconduct of jury in basing finding on facts not in evidence held ground for reversal.**

Where, in a suit for compensation for procuring persons to drill a well for defendants in consideration of the transfer to plaintiff of four sections of oil land, the jurors based their award of compensation on value of oil lands not referred to in the evidence, the misconduct of the jury constituted grounds for reversal, notwithstanding the discretion of the court to grant new trial under Rev. St. 1911, art. 2021, for misconduct of the jury.

Appeal from District Court, El Paso County; P. R. Price, Judge.

Action by John C. Robbins, Jr., against the Finlay-Tampico Oil Company and others. Judgment for plaintiff, and defendants appeal. Reversed and remanded.

Jones, Jones, Hardie & Grambling, of El Paso, for appellants.

G. Volney Howard and W. E. Rogers, both of El Paso, for appellee.

WALTHALL, J. This suit was brought by John C. Robbins, appellee, against appellants, Finlay-Tampico Oil Company, alleged to be a joint-stock association, E. S. Plumb, C. M. Davis, J. H. Morford, E. Harms, John Roseborough, Jr., and G. Zork, to recover commissions under a contract, alleged to be in parol and by letters, to procure some one to contract with appellants to drill for oil on lands then held and controlled under rental leases and permits by appellants in Hudspeth or El Paso counties, Tex.

Without stating the petition at length, it is alleged that the above-named company is a joint-stock company, and that the other parties named are members thereof and own stock therein, and during the year 1920 were engaged, under the firm name of said company, in buying, selling, and trading in mineral leases and lands in Texas, including the counties of Hudspeth and El Paso, and in prospecting, drilling, and developing lands for oil and other minerals; that about the 1st day of May, 1920, appellants contracted orally and by correspondence by letters with appellee to procure a man, or number of individuals, company, or corporation who would contract with appellants to drill for oil on their said lands in either of said counties, then held by appellants under mineral leases and permits, the aggregate acreage of said lands in said two counties then exceeding 150,000. It is alleged that by the terms of their said contract with appellee, appellants contracted that if appellee procured some one to sink a well to a depth of 3,500 feet on said lands, upon terms and conditions

stated by appellants, appellants would, when the drilling site was located, transfer commercial mineral leases of 88 form on four sections of said lands, two of said sections to be not more than two miles from the drilling site, and the other two not to be more than seven miles from said drilling site.

Appellee alleged that, acting upon said agreement, he did, in June, 1920, present and introduce to appellants one W. G. Yates, and through and by Yates introduced the W. A. Boole Syndicate and W. A. Boole, who were then in the business of contracting for and drilling such prospect wells as appellants desired to contract for, and that appellants did, about the 1st day of December, 1920, contract with said W. G. Yates and the W. A. Boole Syndicate and W. A. Boole to put down a well on said lands in all things as by appellee and appellants agreed. Appellee alleged the refusal of appellants to pay appellee for his said services and refusal to lease or transfer to appellee said sections. Appellee alleged the value of said two sections within two miles of the well location to be $10 per acre, and the value of the two sections within seven miles of the well location at $5 per acre, and that his services were worth said sums. Appellee sued to recover the said value of said leases.

Appellants answered by general demurrer, general denial, and special denial that appellee was the procuring, efficient, or producing cause of any contract entered into between appellants and the Boole Syndicate; alleged that the contract entered into with the Boole Syndicate was entirely different from the contract which appellee attempted to procure for appellants with other individuals; alleged that appellee was unsuccessful in procuring any customer for appellants; and that several months after appellee had ceased his efforts to procure a customer, appellants, through a different source, came in contact with said syndicate and entered into a contract with said syndicate.

No service having been had on J. H. Morford, the suit was dismissed as to him.

The case was tried with a jury and submitted upon special issues.

The jury found all issues submitted, and on which findings were made, in favor of appellee. The jury having found that appellants and appellee entered into the contract as alleged, and that appellee was the efficient and procuring cause of the contract entered into between appellants and W. A. Boole, and that commercial leases or permits located within two miles of the well as contracted for by appellants had a market value, and that such leases or permits on two sections of land so located were reasonably worth $2,560 on the date of the location of the site of the well, judgment was rendered in favor of appellee for said sum.

Judgment was also rendered in favor of appellee for $281.60 as the value of commercial oil lease or permit of the two sections within seven miles of the site of the well, but that portion of the judgment was remitted by appellee, and we need not further refer to it.

Appellants present six propositions, but, practically, there are only two. The pleadings of appellee and the evidence offered show that the contract between appellee and appellants was to the effect, as stated above, that if appellee, Robbins, would procure or cause to be procured and present to appellants an individual, a company, or corporation who would contract with appellants to sink a well to the depth specified, the contract on the part of appellee would have been performed. Appellee, in June, 1920, presented W. G. Yates to the appellants as a man who would get appellants a man to drill the well in compliance with the contract, and Yates procured W. A. Boole, of the Boole Syndicate, with whom appellants did contract to sink the well. Appellee, Robbins, did not, in person, present Boole, but did through Yates.

Robbins testified:

"I introduced Mr. Yates to Mr. Davis (one of appellants and at that time secretary and treasurer of appellant company), and told Mr. Davis that this was the party I had mentioned that was down at Pecos, who had some California parties whom I understood could drill a well for them if they desired, referring to Mr. W. A. Boole in California. * * * I understand from Mr. Yates and Mr. Roseborough that they got in touch with Mr. Boole some time along in the fall of 1920. * * * I did not present Mr. W. A. Boole in person to the defendants, but I presented him through Mr. Yates."

Yates testified that he found Boole and introduced him to appellants.

[1] Appellants refer us to Goodwin v. Gunter, 109 Tex. 56, 185 S. W. 297, 195 S. W. 848, as sustaining their propositions to the effect appellee not having procured a customer ready, able, and willing to enter into the contract upon the terms authorized, he is not entitled to his compensation. We think that case does not conclude the point here presented, in appellants' favor. That case is quite lengthy, and we must refer to the case for an extended statement of the contract declared upon and the facts. In that case Goodwin was not dealing directly either with Mrs. Gunter or with Judge Bliss, her representative. He acted entirely through Witwer, and, as stated in the opinion, his right to the commissions claimed depended upon the legal effect of Witwer's acts. In that case it was distinctly found that Lindsley, the purchaser, was not procured as a purchaser through Witwer. The opinion states that if by uncontroverted proof it was established that Witwer's action produced

Lindsley as the purchaser, Goodwin would be entitled to recover as a matter of law. In that case the record presented evidence from which the trial court could conclude, and did conclude, that Witwer did not procure Lindsley as the purchaser. The Supreme Court does not try the facts of the case, and was bound by the facts found. In that case the Supreme Court restates the well-settled rule to be that the commissions are earned by a broker, and he is entitled to their payment according to the contract, if, while the contract is in force, he procures a purchaser to whom the owner directly makes a sale upon terms which are satisfactory to himself, though different from those limited to the broker and yielding a less amount than that for which the broker was empowered to sell, as said in the opinion, where the owner makes a sale to the purchaser produced by the broker, but on terms different from those given the broker, the owner will be deemed to have waived the terms to which the broker was confined, and the law declares him liable for the commissions fixed by the contract. In the instant case the contract was that Robbins was to "find a man who was to find a man" to sink the well. The contract between appellants and appellee as to the commissions to be paid was plain and specific. The first two propositions are overruled.

The remaining propositions present questions of fact complaining of the misconduct of the jury in arriving at their verdict.

It is asserted that the jury considered evidence as to values of the leases not introduced upon the trial; considered the fact that appellee would be compelled to pay out a portion of the amount recovered as attorneys' fees; that the jury arrived at their verdict as to values by lot; that the verdict returned is so manifestly against the great weight and preponderance of the evidence as to lead to the conclusion that the jury was influenced by improper motive, or by statements made in the jury room and not based upon the evidence introduced upon the trial. The trial court heard the evidence on the question of misconduct of the jury in passing upon the motion for a new trial and overruled the motion, but made no findings of fact in passing upon the issues of fact presented on the motion. Extracts from the evidence of four of the jurors are copied in appellants' brief.

Juror Sorrells testified:

"There were two or three members of the jury stated they had purchased oil leases from the Hueco Basin Oil Company out here, and paid '$2.50 an acre for such leases, and these leases they knew to be of as much value as the Hueco Basin leases. That discussion influenced me at arriving at a verdict in a way. In reference to the attorney's fees, some two or three of the men, I don't remember just who, or how many, said that even on that bas-

is of a verdict as we are rendering, that the plaintiff would have nothing left after paying his attorneys, or would have very little, at least, and that he was entitled to a fair compensation. The jurors were discussing the valuation of the leases in the Hueco Basin, which is 60 or 75 miles, if I am not mistaken, from this proposition. That juror stated that he paid $2.50 per acre for leases in the Hueco Basin, if I remember correctly. Some two or three jurors spoke of having bought leases there, but I cannot mention their names. However, that matter was discussed by the jury. I heard two and probably three say that they paid $2 and $2.50 an acre. I am telling you what happened in the jury room, in their discussion. They stated that in their estimation the valuation rendered on the Boole well should be as good as the Hueco Basin proposition."

Juror Carson testified:

"After the jury retired to consider of its verdict, one of the jurors mentioned the fact that he had purchased leases from the Hueco Basin people for $2 or $2.50 an acre, and that these leases were just as valuable as the ones he purchased. That matter was freely discussed by the jury."

Juror Savage testified:

"After the jury retired to consider of its verdict, it was a question of getting the value of the land, and I can tell you what I said. I said: 'You talk about 25 cents an acre; you show me any acreage you can buy anywhere near Hueco Basin, Tularosa, or Newman for $2 an acre, and I think that price is about right.' And then somebody jumped up and said, 'Yes, I paid $2 or $2.50 for leases in the Hueco Basin.' That is how that question arose. We were voting to get an average of what land was worth. It was generally discussed by myself and other jurors as to what had been paid for land of a similar character. Each one was called on to state what they knew. It was generally talked about. We discussed the matter of his attorney's fees and his expenses. We talked of various things."

Juror Hepburn testified:

"I mentioned the fact that I had bought leases for $2.50 per acre. * * * I told them the land was located in the Hueco Basin. Mr. Sorrells insisted that the land was not worth more than 10 cents and he could buy all he wanted, and I simply mentioned that I had paid $2.50 to try to convince him, in order to arrive at something like a fair average. I mentioned that to influence Mr. Sorrells in arriving at a fair value. That was my purpose in mentioning to him the fact, in order to get him to raise his vote."

Other jurors testified as to the matters complained of in the propositions. According to the statements of jurors as to what occurred in the discussion of the values of commercial leases within two miles of the well located by appellants, while there was some difference in their statements as to what occurred, they were agreed that a number of ballots were taken on the values of

the leases, ranging from 25 cents an acre to $7.50 an acre. At that time one or two of the jurors mentioned the fact that they had purchased leases in the Hueco Basin, some 50 or more miles away, at $2.50 an acre, and argued that lands within 2 miles of appellants' well would have about the same value. One juror said he was influenced by the statement as to value. Others were not influenced and said the jury's attention was called to the fact that the jury should be governed by the evidence introduced. While some of the jurors said the jury finally agreed to write the amount to which each would agree, as to value, and divide the sum total by 12, and abide by the result, others said there was no agreement to abide by the result thus reached, and that as a matter of fact other votes were taken as to value after the division by 12, as above, had been made. Some jurors heard remarks made as to what would remain to appellee after the attorney's fee had been taken out; others did not hear such remarks. The value of leases within two miles of the well was finally fixed by the jury at $2 per acre.

The evidence introduced on the trial on the values of the commercial leases involved here varied from 5 cents per acre to several dollars per acre.

Article 2021, Revised Statutes, provides that on the trial of the motion for a new trial, where the ground of the motion is misconduct of the jury, if the misconduct be proven, or the testimony received, be material, a new trial may, in the discretion of the court, be granted.

There is no doubt but that at least some of the jurors made statements in the jury room, and to other jurors, as to the amount they had paid for similar leases in other localities, and made arguments to some members of the jury as to the value of the leases in the case the jury were then considering based on the statements thus made as to values. The issue as to the value of the leases was one of the material issues in the case. The difficulty of the question arises in view of the provision of the statute that the matter of granting or refusing the motion on the ground of misconduct of the jury is largely within the discretion of the trial court.

In Railway v. Gray, 105 Tex. 42, 143 S. W. 606, after quoting the above provision of the statute and making comments thereon not necessary to state here, Chief Justice Brown, speaking for the Supreme Court, said:

"After proper consideration given to the briefs furnished, we conclude that the 'discretion' expressed in the act above copied is upon the same level with the discretion vested in the trial judge in many instances, and that we may review its exercise wherein it clearly appears that the rights of the parties have been disregarded. If the evidence taken by the trial judge left it reasonably doubtful as to the effect the statement had upon the amount of the verdict of the jury, we would feel inclined to exercise our authority and set it aside; but the jury who tried the case seems to have acted promptly and fairly in the investigation, and we know that he could form safer conclusions from examining the jurors than this court can from the record. There is much in looking at the man who testifies."

We have concluded that, while the above case clearly states the controlling principles that should govern appellate courts in passing upon the matters presented, the facts of this case in the matter of the misconduct of the jury go beyond those in the above cited case. In this case the trial judge heard the testimony of the jurors. The statement of the jurors that the leases in a locality some 50 or more miles from the lands then under investigation were worth $2.50 per acre, and that the lawyers representing appellee would get a part of that, seems to have materially influenced one or more of the jury in finding that the leases were of the value of $2 per acre, although the evidence offered on the trial would have sustained a finding of more than double that amount. Here the testimony of the jurors seems to indicate that the jury had already concluded that the appellee should recover, and the only thing remaining was as the value of the leases within two miles of the well.

[2] We have concluded that the evidence offered on the trial of the motion shows that a higher value was given the acreage near the well by reason of the statements of the jurors as to sales in the Hueco Basin, and other places, and the statements that attorneys would receive a portion of what was awarded appellee, and that by reason of such statement upon the value of the lands the verdict should have been set aside and a new trial granted. Louisiana Western Ry. Co. v. White (Tex. Civ. App.) 202 S. W. 794; West Lumber Co. v. Tomme et al. (Tex. Civ. App.) 203 S. W. 784; German v. Railway Co. (Tex. Civ. App.) 222 S. W. 662; Manes v. J. I. Case Threshing Mach. Co. (Tex. Civ. App.) 204 S. W. 235, and cases there cited.

While we are loath to disturb the finding of the trial courts in the exercise of the discretion given by the statute in passing upon questions of misconduct of juries, we feel that the above-cited cases should control when a verdict has been influenced by improper conduct of the jury.

For reason stated, the case is reversed and remanded.